**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**WESTERN DIVISION, OXFORD**

**DONALD and JANET BETTS,**
**individually, as the parents of**
**CHRISTOPHER ADAM BETTS,**
**deceased, and as the parents and**
**natural guardian of**
**JONATHAN WESLEY BETTS**

       **Plaintiffs,**

**vs.**                                                                 **Case No. 3:04cv169-M-A**

**GENERAL MOTORS CORPORATION,**

       **Defendant.**

_____

## MEMORANDUM AND ORDER

The court has before it numerous motions filed by plaintiffs and defendant in the above titled action.  Defendant has filed motions to exclude the testimony of plaintiffs' expert witnesses, Donald Phillips, Herbert Yudenfriend, Michael Reyes, Allan Kam, and Steve Batzer, as well as a motion to strike proposed changes to Dr. Batzer's deposition.  Plaintiffs have filed a motion to exclude the expert testimony of defendant's witness, Kon-Mei Ewing, as well as a motion for leave to submit an amended errata sheet in response to defendant's motion to strike. Defendant has also filed two motions for partial summary judgment.  With regard to these motions, the court rules as follows:

## A. Facts and Procedural Posture

On the morning of October 23, 2003, Christopher Adam Betts, while traveling to school with his younger brother Wesley, ran off the right side of Longview Road in Pontotoc County,

Mississippi. Attempting to reenter the road, his 1988 GMC Sierra rolled over, and he was killed. His younger brother was not seriously injured in the accident. Both of the truck's occupants were properly and fully belted at the time.

Plaintiffs allege that during the accident the tempered glass window of the driver's side door broke, shattered, and evacuated the window opening. As a result, Adam's head and torso were ejected through the driver's side window opening, allowing his head to be crushed between the door's top window rail and the ground.

Plaintiffs filed this lawsuit against General Motors Corporation (GM) on August 31, 2004, alleging that Christopher Adam Betts died as a result of defects in the windows and occupant restraint system of the 1988 GMC Sierra that he was driving at the time of the crash.


**B. Defendant's Motion to Strike Proposed Deposition Corrections**

Defendant GM has moved the court to strike changes made by plaintiffs' expert Dr. Steve Batzer to his March 7, 2008, deposition testimony [194]. Plaintiffs moved for leave to submit an amended errata sheet for Dr. Batzer's testimony on May 21, 2008 [204]. The basis for these motions is the plaintiffs' submission of an errata sheet, pursuant to Federal Rule of Civil Procedure 30(e), containing clarifications and corrections to the deposition of Dr. Batzer. Upon reviewing the motions, responses and replies, the court finds that defendant's motion to strike should be granted, while plaintiffs' motion for leave should be denied.

Rule 30(e) of the Federal Rules of Civil Procedure provides that "the deponent shall have thirty days . . . in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them." Although the Fifth Circuit has not further defined the scope or context of this rule, nor published any opinions constituting binding precedent on this subject, it has held in an

unpublished opinion that the requirements of Rule 30(e) must be strictly followed.  *Reed v. Hernandez*, 114 Fed. Appx. 609, 611 (5th Cir. 2004).  Among other courts, however, including sister districts within this circuit, a split as to the proper interpretation of Rule 30 has emerged.  *See Order* in *Sills v. Enproptech Corp.*, 2006 WL 5157684 (No. 3:05cv32-B-A, N.D. Miss. June 27, 2006).

The majority view accords a plain meaning approach or literal interpretation to Rule 30 and, consequently, allows any change in form or substance regardless of whether convincing explanations support the change.  *E.g., Lutig v. Thomas*, 89 F.R.D. 639, 641 (D.C. Ill. 1981); *Reilly v. TXU Corp.*, 230 F.R.D. 486, 490 (N.D. Tex. 2005).  Proponents of this view support their position by noting that "[t]he language of the Rule places no limitations on the type of changes that may be made by a witness before signing his deposition." *Id.* (internal citations omitted).  Judges utilizing the majority view should not evaluate the credibility of the reasons cited by the deponent for changing his deposition but should merely ensure that the deponent has complied with the technical aspects of the rule.  *E.g.*, *Burch v. Piqua Engineering, Inc.*, 152 F.R.D. 565, 566-67 (S.D. Ohio 1993).

The court is persuaded by the fact that the majority of federal courts addressing this Rule 30(e) issue have interpreted the language of the rules of federal civil procedure as literally as possible and have allowed any form of change to a deposition.  Consequently, the procedural aspects and clear instructions provided by Rule 30(e) must be followed by a deponent.  Although the majority allows "any change in form or substance regardless of whether convincing explanations support the changes," the deponent must still abide by the procedures set forth by the rules and include stated reasons for his proposed corrections.  *Sills*, 2006 WL 5157684.

Plaintiffs argue that the deponent's errata sheet has satisfied not only the intention of the rule but its explicit language as well because the corrections made are obvious enough that

formally stated reasons would be almost redundant. This assertion clearly conflicts with the reasoning of a majority that demands a literal translation of Rule 30(e). The term "reason" should be interpreted in its most common sense meaning: a statement explaining the deponent's reasons for making the change. *See Id.* Dr. Batzer should have incorporated his reasons for his nine proposed changes in his errata sheet. His failure to do so should result in the exclusion of those changes from his deposition.

In response to GM's motion to strike, plaintiffs have filed a motion for leave to submit an amended errata sheet. Plaintiffs assert that the Federal Rules of Civil Procedure "should be construed and administered to serve the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Relying on the Southern District of Ohio's decision in *Burch v. Piqua Engineering, Inc.* granting an additional fifteen days for compliance with Rule 30(e), plaintiffs have moved the court for leave so that Dr. Batzer may provide reasons for his corrections and satisfy the procedural requirements of Rule 30(e). *See Burch*, 152 F.R.D. at 567.

This court, however, finds it highly probable from the holding of *Reed v. Hernandez* that the Fifth Circuit would require strict compliance with the procedural aspects of Rule 30. In *Reed*, the Fifth Circuit affirmed a district court's determination to exclude an errata sheet based on its untimely filing and improper subject matter stating, "Rule 30(e) does not provide any exceptions to its requirements." *Reed*, 114 Fed. Appx. at 611. The Fifth Circuit's emphasis on the importance of following the rule's explicit instructions on the thirty-day time period clearly carries to the requirement that a deponent provide reasons for any proposed changes or corrections to a deposition. Therefore, plaintiffs' motion for leave to submit an amended errata sheet is denied, and defendant's motion to strike Steve Batzer's proposed deposition changes is granted.

### C. *Daubert* Motions

The court now turns to several motions filed by both plaintiffs and defendant to exclude various expert witnesses pursuant to *Daubert v. Merrell Dow Pharmaceuticals.* In *Daubert,* the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. *Daubert v. Merrell Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *Daubert* requires that "when expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case." *Watkins v. Telesmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997). In response to *Daubert*, Rule 702 of the Federal Rules of Evidence was amended to provide:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
> Fed. R. Evid. 702.

*Daubert* set forth a non-exclusive checklist for trial courts to use in determining the reliability of expert testimony. These factors include: (1) whether the expert's technique or theory has been tested; (2) whether the technique or theory has been subjected to peer-review and publication; (3) the known or potential rate of error applicable to the technique or theory; (4) the existence of standards and controls applicable to the technique or theory; and (5) whether the technique or theory is generally accepted in the scientific community. *Daubert*, 509 U.S. 579 (1993).

The trial judge is responsible for ensuring that the proposed testimony is supported by "good grounds." *Id.* at 590. The party offering the witness as an expert bears the burden of demonstrating that the proffered expert opinions are based upon accepted methodology and reliable data. *Id.* at 591, n. 10; *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). *Daubert*, however, did not work a "seachange over federal evidence law," and "the trial

court's role as gatekeeper is not intended to serve as a replacement for the adversary system."

*United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078

(5th Cir. 1996). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of

contrary evidence, and careful instruction on the burden of proof are the traditional and

appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595. After

having considered the aforementioned factors, the court rules as follows:

**1. Donald Phillips [196]**

GM asserts that Donald Phillips should not be allowed to offer expert testimony

regarding any opinions about automotive glazing at trial because he is not a qualified expert.

GM further argues that Phillips' opinions are not reliable because they are not based on sound

methodology. Plaintiffs, however, assert that defendant's *Daubert* challenge is moot because

they do not plan to use Phillips as an expert witness, but rather only as a fact witness to describe

certain testing he has conducted upon which their proposed glazing expert, Dr. Steven Batzer,

has relied. Therefore, because Donald Phillips will not testify as an expert in this case, this court

will deny GM's *Daubert* challenge to Donald Phillips as moot.

In response to Donald Phillips' conversion from expert to fact witness, GM argues that

his testimony should be excluded because of plaintiffs' failure to properly disclose him as a

witness before the discovery deadline. Discovery was extended by this court's decision allowing

plaintiffs to substitute Dr. Batzer for Mr. Phillips as their automotive glazing expert. GM argues

that the improper disclosure of Mr. Phillips as a fact witness after the expiration of extended

discovery on May 15, 2008, should result in the exclusion of all his proposed testimony, fact or

expert, in this case. Defendant, however, had ample time to depose Mr. Phillips as an expert and

will not be unfairly prejudiced by his testimony. No rule of law exists precluding an expert

witness from being converted to a fact witness after the expiration of discovery.  Mr. Phillips will be allowed to testify; however, his testimony will be limited only to the facts of which he is personally aware.

**2. Herbert Yudenfriend [192]**

Defendant next challenges the expert testimony of Herbert Yudenfriend.  GM only asserts that Mr. Yudenfriend is unqualified to deliver two opinions:

A.  The tempered glass side window system in the driver's side door of the 1988 GMC K1500 was defective and unreasonably dangerous when it left GM's assembly plant, because it did not mitigate the possibility of ejection of Mr. Betts' head in the context of this foreseeable rollover accident (§A at page 3); and

B.  Mr. Betts' head would have been retained in the vehicle if the driver's side door had been made of high penetration resistance laminated glass, bilaminate window glass or heat strengthened laminated glass (§B at pages 3-4).
Expert Report of Herbert Yudenfriend.

Plaintiffs have asserted that Mr. Yudenfriend will not offer these objected to opinions at trial; therefore, GM's motion to limit the testimony of Herbert Yudenfriend is dismissed as moot.

**3. Michael Reyes [206]**

GM next challenges the expert testimony of Michael Reyes.  Relying on the depositions and statements of witnesses, the state medical examiner's report, accident reports, two hundred and four color photographs of the vehicle and the accident site, and the expert report of the plaintiffs' accident reconstructionist, Mr. Reyes will offer various opinions regarding the kinematics of Mr. Betts' ejection from the vehicle and the likelihood that it contributed to his death.  Defendant has moved to strike the opinions of Mr. Reyes on two primary grounds: one, that his testimony is based on unreliable facts and data; and, two, that his testing principles and methods are unreliable and flawed.  Mr. Reyes qualifications are not challenged.

GM's greatest concern is whether Mr. Reyes had a sufficient basis to reach his ultimate conclusion that the contact between Mr. Betts' head and the driver's door top window rail after he was partially ejected from the truck were the likely cause of death. It first argues that Mr. Reyes' testimony is unreliable because he lacked sufficient facts and data about the crash at issue and lacked specific details about the fatal injuries of Mr. Betts. Defendant claims that the alterations of the roof of the truck by emergency personnel at the accident ruin any claim of exactness made by Mr. Reyes on the details of the accident. No expert for either side disputes the specifics of the crash. Although Mr. Reyes readily admits that it is impossible to tell where the driver's side of the vehicle impacted the ground, this does not effect the reliability of his report for *Daubert* purposes.

Further, GM argues that Mr. Reyes lacks specific details about Mr. Betts' injuries because no autopsy was performed. Certainly there is no law which requires an autopsy for a products liability case. Mr. Reyes relied on a sufficient amount of information, including two medical examiner reports of death investigation and Mr. Betts' medical records. As the Fifth Circuit has noted, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *14.38 Acres of Land*, 80 F.3d at 1077 (*quoting Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

GM also argues that Mr. Reyes' opinions are unreliable because his conclusion that the right side skull fractures sustained by Mr. Betts were the result of his head's impact with the driver's door top window railing is unsupported by any scientific theory or technique. Emphasizing U.S. District Judge Daniel P. Jordan's decision to exclude Mr. Reyes's opinions in *Vaughan v. Kia Motors America, Inc.*, GM argues that Mr. Reyes' conclusions are similar unjustified extrapolations from inadequate data. *Vaughan v. Kia Motors, Inc.* (Civil No.

3:05cv38JS, (S.D. Miss. Jan. 11, 2007)). The *Vaughan* court challenged Mr. Reyes' methods because he failed to look at other obvious alternative explanations. In *Vaughan*, there was ample evidence to contradict Mr. Reyes' findings, including deformations in the interior of the cab which suggested other possible explanations for the decedent's injuries, and multiple fractures to the decedent's skull. In this case, there is no evidence of an alternate interior impact, and there is no dispute from either of defendant's experts that Mr. Betts' fatal injuries occurred while his head was outside of the truck's occupant compartment.

Further, in *Vaughan*, Mr. Reyes relied primarily upon the testimony of coroner's office employees who observed the decedent lying face up, and photographs which did not specifically pinpoint the location of the injury. In this case, Mr. Reyes has relied on a full physical examination by emergency room personnel, as well as tests and scans which pinpoint the exact location of Mr. Betts' injuries. Although Mr. Reyes has reached similar conclusions in both cases, the facts and data which he relies upon are case specific. *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194 (5th Cir. 2006) ("Whether a proposed expert should be permitted to testify is case, and fact, specific). Mr. Reyes' opinions in this instance are amply supported by the evidence and based on more than just information readily accessible to the general public.

Finally, GM claims that Mr. Reyes has failed to account for obvious alternative explanations, such as the approximately 36% of rollover deaths which occur each year when the occupant remains fully contained within the vehicle. *See Hill v. Universal Am-Can, Ltd.*, 2007 WL 4355041 (E.D. Tex. 2007). The question of whether an injury was caused by a manufacturer's failure to properly equip a product is a fact question to be resolved by a jury. In almost all cases there will be other alternative explanations regarding the cause of a plaintiff's injuries; however, the existence of other probabilities does not render an expert's opinion unreliable. *See Wagatsuma v. Patch*, 10 Haw. App. 547, 576-78 (1994) (*quoting Campbell v.*

9

*General Motors Corp.*, 32 Cal. 3d 112, 120-21 (1982).  For these reasons, the court denies GM's motion to limit the testimony of Michael Reyes.


### 4. Steve Batzer [208]

GM next challenges the testimony of the plaintiff's automotive glazing expert, Dr. Steve Batzer, regarding whether Mr. Betts' injuries would have been life threatening if he had been completely contained within the truck during its rollover.  GM asserts many of the same challenges to Dr. Batzer as it did to Mr. Reyes, including the reliability of his opinions without knowing the specifics of the crash and the specific details of the decedent's injuries.  As noted before, these issues go primarily to the weight, not the reliability, of his opinions.  Questions of accuracy should influence the jury's determination of the credibility of an expert witness, not the court's determination of his admissibility.  *See 14.38 Acres of Land*, 80 F.3d at 1077.

Defendant also argues that Dr. Batzer has failed to account for obvious alternative explanations, such as the approximately 36% of rollover deaths which occur each year when the occupant remains fully enclosed within the vehicle.  As noted before, the existence of other probabilities does not render an expert's opinion unreliable.  *See Wagatsuma v. Patch*, 10 Haw. App. 547, 576-78 (1994) (*quoting Campbell*, 32 Cal. 3d at 120-21).

GM also asserts that Dr. Batzer should not be allowed to offer expert testimony regarding alternative designs for the door and the roof of the GMC Sierra at trial.  GM claims that the door and roof designs were 1) not properly disclosed during Mr. Phillips' discovery, and are therefore inadmissible for Dr. Batzer as a substitute witness; 2) not properly disclosed in Dr. Batzer's expert report or deposition, and therefore are inadmissable; 3) are only general concepts about proposed alternative designs that have never been tested; and, 4) have been excluded by another court in Mississippi as insufficient.  In addition, defendant argues that Dr. Batzer should not be

allowed to offer expert testimony regarding alternative designs for the glass on the GMC Sierra because he has not tested any of his concepts on similar vehicles.

In challenging Dr. Batzer's alternative designs for the roof and doors of the subject truck, GM argues that he is limited to testifying "as to the same material to which Phillips [would have testified]." Defendant claims that because Donald Phillips never offered any opinions about alternative designs that would make the doors and roof of the subject truck stronger, plaintiffs should not be allowed to create these new opinions through Dr. Batzer after representing that his testimony would cover the same issues as Mr. Phillips. Plaintiffs respond that the proposed door and roof designs of Dr. Batzer are presented only in the context of his proposed alternative side window system, and therefore, his testimony is substantially similar to Mr. Phillips'.

The design of the door and the roof have clear and obvious implications in the functionality of the side window system. The court, aware that differences in testimony between the glazing experts may occur, extended discovery for the purposes of curing any prejudice which might possibly arise from Dr. Batzer's designation. Therefore, as primary glazing expert for the plaintiffs, Dr. Batzer may testify about the entire side window system, and his testimony should not be limited to the extent that defendant wishes.

Defendant next asserts that Dr. Batzer's testimony concerning alternative designs for the roof and doors of the subject truck should be excluded because, as nothing more than conceptualized possibilities, they were not and could not be properly disclosed in either his expert report or his deposition. In the same vein, GM argues that Dr. Batzer's testimony should be excluded because he has failed to produce any specific alternative design for the side window system of a 1988 GMC Sierra. GM argues that Dr. Batzer's alleged inability to articulate a feasible alternative design for the entire side window system should preclude his testimony that:

> Had this vehicle been designed for the purposes of occupant retention, employing laminated side glazing with an adequate peripheral support system, or employed a sufficiently strong greenhouse and mounting hardware to prevent the glazing failure modes of fracture or release of the tempered safety glass, it is statistically likely that Christopher Betts would not have been partially ejected, and his injuries, if any, would not have been life threatening.
>
> *See* Memorandum in Support of GM's *Daubert* Motion to Limit the Testimony of Steve Batzer, p. 1.

In challenging Dr. Batzer's testimony, defendant cites the Fifth Circuit's holding in *Watkins v. Telesmith, Inc.* 121 F.3d 984, 992 (5th Cir. 1997). In *Watkins*, the Fifth Circuit upheld a district court's decision to exclude expert testimony based on the expert's failure to adequately test his proposed alternative design. *Id.*

Defendant highlights Dr. Batzer's lack of testing of his alternative designs on any substantially similar vehicle as evidence of his failure to progress beyond the concept stage of his designs. While the *Watkins* court held that "the proper methodology for proposing alternative designs includes more than just conceptualizing possibilities," it specifically noted that "[t]his is not to say that alternative product designs must always be tested by a plaintiff's expert." *Id.* GM contends that because Dr. Batzer has not prepared product-specific engineering drawings containing his alternative designs, produced those designs, and tested them in a 1988 GMC Sierra truck, his opinions are unreliable. This contention however is unfounded. *Watkins* requires a district court to closely analyze expert testimony to make sure that proposed alternatives are supported by testable methods or calculations which would allow a trier of fact to infer that the opinions of an expert are supported by valid engineering principles.

Though an expert must go beyond "conceptual suggestions" in proposing an alternative design, there is no requirement that the expert actually design, produce, and test their proposed design on the specific product at issue. *Guy v. Crown Equipment Corp.*, 394 F.3d 320, 327 (5th Cir. 2004). As Dr. Batzer's Design Report states, "[this document] does not and can not provide

for *every* conceivable facet of design, manufacture, testing, styling, and marketing. Nor can this

document answer every question that could possibly be raised." Design Report of Dr. Steven A.

Batzer, p. 3 (emphasis in original).

Although Dr. Batzer has not tested his design specifically in a 1988 GMC Sierra truck,

his opinions are no less reliable. As noted in *Tassin v. Sears, Roebuck and Co.*:

> If an engineering expert can demonstrate that his proposed [alternative] design has been
> tested, peer reviewed, or is generally accepted, then so much the better. On the other
> hand, this does not mean that engineering testimony on alternative designs should be
> excluded automatically if it cannot withstand a strict analysis under *Daubert*. The
> inquiry is case specific. It may well be that an engineer is able to demonstrate the
> reliability of an alternative design without conducting scientific tests, for example, if he
> can point to another type of investigation or analysis that substantiates his conclusions.
> .... If the expert's opinions are based on facts, a reasonable investigation, and traditional
> technical/mechanical expertise, and he provides a reasonable link between the
> information and procedures he uses and the conclusions he reaches, then rigid
> compliance with *Daubert* is not necessary.
> *Tassin v. Sears, Roebuck and Co.*, 946 F.Supp. 1241, 1248 (M.D. La. 1996).

Dr. Batzer has relied on numerous tests and engineering studies, including some performed by

GM, in support of his alternative designs. Further, he has been personally involved in the testing

of the retention capabilities of automotive side window glass. Reliance upon industry

knowledge and testing, patents, and other such information is sufficient in determining whether

certain automotive roof and door designs are feasible alternatives. *See James v. Cincinnati Inc.*,

243 Fed. Appx. 25, 28-29 (5th Cir. 2007).

Defendant's next challenge to Dr. Batzer is Judge Jordan's July 11, 2007 ruling in

*Vaughan v. Kia Motors, Inc.* excluding Dr. Batzer's expert testimony primarily for a failure to

finalize his thoughts on a feasible alternative design for a side window system in a KIA

Sportage. In response to Judge Jordan's concerns in *Vaughan*, Dr. Batzer has authored a

meticulous and comprehensive alternative design report which details each of his specific

proposals and identifies certain vehicles which contain his alternative designs. Thus, for these reasons, the court finds that GM's motion should be denied.

### 5. Allan Kam [190]

Defendant next challenges the expert testimony of Allan Kam, plaintiffs' rebuttal witness. Mr. Kam's Expert Report contains information about the background of National Highway Traffic Safety Administration (NHTSA), NHTSA's Safety Act, Federal Motor Vehicle Safety Standards (FMVSS), as well as a history of NHTSA rulemaking on FMVSS 205. GM argues that Mr. Kam's testimony should be excluded because 1) as a lawyer he is not qualified to give opinions in a court of law regarding automotive design and glazing; 2) allowing his opinions is tantamount to usurping the role of the judge because his testimony is his interpretation of the NHTSA rulemaking process and legal opinion; 3) his conclusions are based on inadmissible hearsay; and, 4) his testimony is not based on sufficient facts and data, nor is it the product of reliable principles or methods. As such, GM seeks to exclude Kam's testimony under Rule 702 of the Federal Rules of Evidence.

Defendant asserts that Mr. Kam's opinion that "it is possible for a manufacturer, in designing a part or system to comply with an FMVSS, to choose a smart design resulting in a non-defective product, or a poor design resulting in a defective product" is inadmissible as expert testimony because Mr. Kam is not qualified to give automotive design opinions. Kam Report, at page 10. Mr. Kam, however, is not testifying about automotive designs, but rather is testifying about the standards set forth by FMVSS 205. As noted by the Fifth Circuit in *O'Hara v. General Motors Corp.*, "[o]n its face, FMVSS 205 is a materials standard that sets a safety 'floor' to ensure that the glazing materials used by manufacturers meet certain basic requirements." *O'Hara v. General Motors Corp.*, 508 F.3d 753, 760 (5th Cir. 2007). Mr. Kam's

specialized knowledge of NHTSA's history, procedures, studies, and rule-making will provide beneficial assistance to the trier of fact in understanding the intricacies of federal vehicle safety rules, including their background and their standards for compliance.

GM cites to *Bammerlin v. Navistar* as support for its attempt to exclude Mr. Kam's testimony. In *Bammerlin*, the Seventh Circuit reversed a jury verdict after the district court erroneously permitted experts to interpret FMVSS 208 stating, "[t]he meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court." *Bammerlin v. Navistar International Transportation Corp.*, 30 F.3d 898, 900 (7th Cir. 1994). While the language of *Bammerlin* seems to support GM's claim, its facts make it clearly distinguishable. The expert in *Bammerlin* testified that the seat belt assembly at issue was defective because it did not comply with FMVSS 208. *Id.* at 900. *Bammerlin* does not hold that all expert testimony regarding federal regulations are impermissible interpretations of law, but rather that an expert is simply not permitted to testify whether the product violated or complied with the standard. *Id.* at 901; *Contini v. Hyundai Motor Co.*, 876 F.Supp. 540, 543 (S.D.N.Y. 1995).

Other circuits, including the Fifth, have similarly concluded that testimony regarding general background information of federal regulations is admissible as long as the expert is not stating ultimate legal conclusions based upon those background facts. *United States v. Dotson*, 817 F.2d 1127, 1132 *aff'd in pertinent part on reh'g*, 821 F.2d 1034 (5th Cir. 1987) (IRS expert permitted to summarize and analyze facts indicating willful tax evasion so long as he did not "directly embrace the ultimate question of whether [the defendant] did in fact intend to evade income taxes."); *United States v. Bilzerian*, 926 F.2d 1285, 1294-95 (2nd Cir.), *cert. denied*, 502 U.S. 813 (1992); *United States v. Barile*, 286 F.2d 749 (4th Cir. 2002). As plaintiffs note in their response, Kam's testimony, which is mostly rebuttal in nature, will provide only background

information regarding the FMVSS. The key issue then, is whether Kam's testimony will include any opinions on whether the 1988 GMC Sierra was in violation of FMVSS 205 or whether the vehicle was defective. This court determines that Mr. Kam's proposed testimony does not include these types of legal conclusions, and the court will permit no such testimony at trial.

GM also alleges that the Interim NHTSA Reports, Preliminary Memoranda and NHTSA Notice of Proposed Rulemaking that Mr. Kam proposes to discuss are inadmissible hearsay that do not satisfy the requirements of FRE 803(8)(C). Defendant cites to *Smith v. Isuzu Motors, Ltd.* as support for its attempt to exclude Section VI(B) of Mr. Kam's expert report. In *Smith*, the Fifth Circuit affirmed a district court's conclusion that Interim NHTSA Reports and other memoranda were inadmissible hearsay. *Smith v. Isuzu Motors, Ltd.*, 137 F.3d 859, 861-63 (5th Cir. 1998). In *Smith*, however, the trial court was refusing to admit these documents into evidence. *Id.* According to Federal Rule of Evidence 703, "the facts or data need not be admissible in order for the opinion or inference to be admitted." Therefore, Mr. Kam may testify about these documents.

Defendant's final objection to Mr. Kam is that his testimony concerning FMVSS 205 is not the product of reliable principles and methods and is not an opinion reached after he has applied principles and methods reliably to the facts of this case. Although the *Daubert* factors do not translate easily to the particular type of testimony that Mr. Kam offers, the court concludes that Mr. Kam is qualified and reliable on the basis of his twenty-five years of experience, training, and specialized knowledge to render rebuttal expert testimony in this case. Therefore, GM's motion to exclude the testimony of Allan Kam will be denied at this juncture. While the court concludes that Kam may testify in this case, nothing in this court's ruling prevents GM from raising certain objections at trial to specific testimony of this witness, and the court will consider any such objections at trial.

**6. Kon-Mei Ewing [215]**

In the summer of 1978, after obtaining a Master's degree from the University of California, Berkeley's Department of Materials Science and Mineral Engineering, Kon-Mei Ewing was hired by General Motors as an engineer. GM employed Ms. Ewing in various engineering related positions including project leader, group manager, and development engineer for the next twenty-years. Then, in the summer of 1999, Ewing began working in GM's Field Performance Assessment group, which examines and analyzes the performance of GM vehicles in the field. As a Senior Staff Analysis Engineer, her duties include providing litigation support on product liability matters. Plaintiffs challenge Ms. Ewing as an expert in the area of automotive engineering and glazing, citing her lack of qualifications, her relationship with GM, and her lack of sufficient data to support her conclusions.

Plaintiffs allege that Ms. Ewing lacks the necessary qualifications in the field of automotive glazing to be considered an expert. Specifically, they emphasize her background as a metals and welding engineer, claiming she has no formal automotive glazing education and no training, experience, skill or knowledge that would assist the jury in understanding the evidence or determining a fact at issue. "Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Kumho*, 526 U.S. at 147 (*quoting Daubert*, 509 U.S. at 589). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject," and her testimony would not assist the trier of fact. *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).

The Fifth Circuit has determined that an expert assists the trier of fact when she can "bring to the jury more than the lawyers can offer in argument." *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986). The focus of *Daubert* is not on

qualifications, however, but on reliability. "As long as some reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping function." *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded by statute on other grounds as noted in* Mathis v. Exxon Corp., 302 F.3d 448, 459 n. 16 (5th Cir. 2002). Although Ms. Ewing lacks a high degree of specialization in automotive glazing, "the witness's lack of specialization usually goes to the weight of the witness's testimony but does not disqualify the witness." *Porter v. American Optical Corp.*, 641 F.2d 1128, 1138 (5th Cir. 1981). Further, "[[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

The inquiry into whether Ms. Ewing's testimony is reliable, however, is more difficult. Plaintiffs first allege that Ms. Ewing's proposed testimony is based on unreliable principles and methods, as well as insufficient data and facts. In 1993, the Supreme Court established in *Daubert* the list of factors used to determine the reliability of expert opinions. The four factors identified in *Daubert* form the starting point of the inquiry into the admissibility of expert testimony. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002). However, "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho*, 526 U.S. at 150.

The court finds that the record indicates that Ms. Ewing's knowledge, experience, and education as an automotive engineer with GM for thirty years sufficiently justify her proffered opinions. The Advisory Committee wrote that "[n]othing in this [2000] amendment [to FRE 702] is intended to suggest that experience alone - or experience in conjunction with other

knowledge, skill, training or education – may not provide a significant foundation for expert testimony." Fed. Rule Evid. 702 advisory committee note (2000).

Plaintiffs also argue that Ms. Ewing is a paid GM advocate who has simply been dubbed an expert for the purposes of defending their use of tempered glass, specifically noting that in her entire career she has never determined that a GM vehicle was defective despite certain products being designed below GM's own standards. The Advisory Committee Notes to the 2000 Amendment of Federal Rule of Evidence 702 state that in addition to the *Daubert* factors:

> [O]ther factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact . . . include: (1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of litigation or whether they have developed their opinions for the purposes of testifying.
> Fed. R. Evid. 702, 2000 Amend.

The Fifth Circuit has similarly warned that when "an expert becomes an advocate for a cause, he therefore departs from the ranks of an objective expert witness, and any resulting testimony would be unfairly prejudicial and misleading." *Viterbo*, 646 F.Supp. at 1425. On the other hand, "[t]hat an expert testifies for the money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture." *Daubert*, 43 F.3d at 1317.

Ms. Ewing's reliability stems not solely from her current position as a member of the GM Field Performance Assessment Department, but also from her thirty years of experience in automotive engineering. Accordingly, the court disagrees with plaintiffs' argument that Ms. Ewing is not qualified because her testimony will not be objective. For the reasons previously stated, plaintiffs' motion to strike the expert testimony of Kon-Mei Ewing will be denied. While the court thus concludes that Ewing should not be precluded from testifying in this case, nothing

in this court's ruling prevents plaintiffs from raising specific objections at trial to specific testimony of this witness, and the court will consider any such objections at trial.

**7. Consolidated *Daubert* Hearing [217]**

Plaintiffs' motion for a consolidated *Daubert* hearing regarding the motions to exclude Donald Phillips and Kon-Mei Ewing will be denied, based upon the court's order issued this date.

## D. Motions for Summary Judgment

The court next considers two motions for summary judgment filed by GM General Motors Corp., pursuant to Federal Rule of Civil Procedure 56. Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of a material question of fact is itself a question of law that the district court must consider before granting summary judgment. *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). In reviewing this evidence, the district court must draw all reasonable inferences in favor of the nonmoving party, and avoid credibility determinations and weighing of the evidence. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133 (2000).

While all legitimate factual inferences must be viewed in the light most favorable to the non-movant, Rule 56(c) mandates the entry of summary judgment "against a party who fails to

make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Anderson*, 477 U.S. at 255. Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial." *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992); *see Celotex*, 477 U.S. at 323.

Under Mississippi law, a product is defective by design, if, at the time the product left the control of the manufacturer, (a) the seller knew or should have known about the danger that caused the damage for which recovery is sought; (b) the product failed to function as expected; and (c) there existed a feasible design alternative that would have to a reasonable probability prevented the harm. Miss. Code Ann. § 11-1-63. In its motion for partial summary judgment regarding plaintiffs' seat belt design defect claim, GM contends that plaintiffs lack competent evidence to prove their seatbelt design defect claim for four reasons: 1) they have no proof of a defective and unreasonably dangerous condition when the seatbelt left GM; 2) they have no proof that the product failed to function as expected; 3) they have no competent evidence of an alternative design; and, 4) they have no competent proof that the seatbelt caused their damages.

In its motion for partial summary judgment as to plaintiffs' glass defect claim, GM contends that plaintiffs' lack competent evidence on the following essential elements of their burden of proof: 1) they cannot conclusively prove that the panel of glass at issue in the subject truck was the same panel of glass in the driver's side window at the time the truck left GM's control; 2) they cannot prove that the glass failed to function as expected; and, 3) they lack competent evidence of a feasible design alternative that to a reasonable probability would have prevented the death of Adam Betts. The court, having considered the memoranda and submissions of the parties, concludes that defendant's motion for partial summary judgment on

21

plaintiffs' seatbelt claim should be granted, but its motion for partial summary judgment on plaintiffs' glass defect claim should be denied.

**1. Seatbelt Design Defect Claim [185]**

Miss. Code Ann. § 11-1-63 appears to set forth a negligence-based standard in a design defect case which requires a plaintiff to prove by the preponderance of the evidence "that at the time the product left the control of the manufacturer," the manufacturer knew, "or in light of reasonably available knowledge or in the exercise of reasonable care, should have known about the danger that caused the damage for which recovery is sought;" as well as, the existence of a "feasible design alternative" and proof that the product "failed to perform as expected." Miss. Code Ann. § 11-1-63(f). In addition, it requires plaintiffs in all defect cases to establish that "[t]he defective condition rendered the product unreasonably dangerous to the user or consumer." Miss. Code Ann. § 11-1-63(a)(ii).

GM first contends that plaintiffs have no competent evidence of a feasible alternative design for the seatbelt of the subject truck. For plaintiffs to successfully assert a design defect claim under Mississippi law, they must prove that a feasible design alternative existed that would to a reasonable probability have prevented the harm. "A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." Miss. Code Ann. § 11-1-63(f)(ii). Plaintiffs argue that a General Motors designed seatbelt, which in 1983 was added to the GMC Malibu after a series of tests showed its ability to restrain an occupant within a vehicle even during severe rollovers, satisfies the feasible design alternative requirement. Plaintiffs claim that had the 1988 GMC Sierra's seatbelt performed in the same manner as the 1983 Malibu's, Mr. Betts would not have been fatally injured in his rollover accident.

This conclusory assertion notwithstanding, plaintiffs have failed to provide any evidence of how this alternative design would have affected the utility, usefulness, practicality, or desirability of the Sierra's seatbelt design. "A product's design is not defective simply because the manufacturer could have made it safer." *Glenn v. Overhead Door Corp.*, 935 So. 2d 1074, 1082 (Miss. App. 2006). The failure to prove a feasible alternative design precludes recovery for a plaintiff in a design defect claim under § 11-1-63; therefore, GM's motion for summary judgment on the seatbelt design defect claim will be granted.

**2. Glass Design Defect Claim [210]**

Before a manufacturer can be found liable under Mississippi products liability law, plaintiffs must establish that the defect in the product existed "at the time the product left the control of the manufacturer." Miss. Code. Ann. § 11-1-63(a). "Under this statute [GM's] liability is as a manufacturer and seller only of its own products." *Wolf v. Stanley Works*, 757 So. 2d 316, 320 (Miss. App. 2000). GM contends that summary judgment is appropriate because plaintiffs cannot conclusively prove that the driver's side window which shattered during Adam Betts' rollover was the same glass that it originally installed. The certified title histories for the subject truck from Alabama and Mississippi prove that the truck was owned by numerous companies and individuals during the more than 15 years before plaintiffs purchased it. Further, experts from both sides opine that no proof exists to sufficiently conclude that the window in the subject truck contained its original GM installed glass. GM argues that proof of product identification for the side window is an uncontested material fact and is of critical significance to plaintiffs' claim in this case. *See Wolf*, 757 So. 2d at 321.

Plaintiffs contend that the entire side window system of the GMC Sierra was defective and unreasonably dangerous in that it failed to minimize the possibility of occupant ejection.

Plaintiffs do not claim that a design which merely substitutes laminated glass for tempered glass would be sufficient to correct GM's design defect, but rather that the GMC Truck was defective and unreasonably dangerous because of both the glazing, and the framing and structural support for the glazing.

Citing Miss. Code Ann. § 11-1-63 and *State Stove Manufacturing Co. v. Hodges*, the *Wolf* court noted that regardless of whether a product had to reach the consumer "without substantial change in the condition in which it was sold" or must now be defective, according to the statute, "at the time the product left the control of the manufacturer or seller," the overriding concept is that "the manufacturer is responsible for the product that it made, not for the product that exists after subsequent changes." *Wolf*, 757 So. 2d at 319-320 (*quoting State Stove Manufacturing Co. v. Hodges*, 189 So. 2d 113, 118 (Miss. 1966)).

The product at question is the GMC Sierra's entire side window system, not just the tempered glazing. Plaintiffs do not suggest that installing another piece of glass would have prevented Adam Betts' death. Plaintiffs' own expert, Dr. Batzer, admitted in his deposition that if GM only made his proposed changes to the glass of the side window system, Adam Betts would still have died "because of the roof crush." Batzer Deposition, p. 66, lines 14-18. The possibility that the glazing in the driver's side door window was not the original piece installed by GM should not negate its responsibility when there is no argument from either side that the substitution of one pane of tempered glass for another would have caused any material change in the performance of the side window system at issue. Unlike in *Wolf*, where "the sensor rebuilt by a different company had to be involved in the causation," in this case, plaintiffs have established sufficient proof from which a reasonable jury could conclude that Adam Betts' death was caused by a defect that existed at the time the truck was manufactured by GM. *Wolf*, 757 So. 2d at 322.

GM next argues that plaintiffs have no proof that the glass in the driver's side window "failed to function as expected," as required by Miss. Code Ann. § 11-1-63(f)(ii).  In her expert report, GM's glass expert, Kon-Mei Ewing, stated that "[t]he window glazing used in the driver door window did not fail to function as expected."  Ewing Report, page 4, Opinion (D).  She went further, alleging that "[t]he fact that movable side window glass can break when a pickup truck is involved in a rollover crash is a fact that is recognized by ordinary persons with ordinary knowledge common to the community of automotive users."  *Id.*, Opinion (C).

GM contends that plaintiffs have failed to satisfy § 11-1-63 and, therefore, summary judgment should be granted.  *See Glenn*, 935 So. 2d at 1080-81 (noting that the Mississippi Supreme Court has concluded that a product must pass both the risk-utility and the consumer expectation tests).  It is debatable as to whether an ordinary consumer would have contemplated that a fully belted occupant, involved in a rollover accident at low speed, would have his head ejected from the driver's side and window.  As noted in *Cooper v. General Motors*, "the consumer has the right to expect that the vehicle will be reasonably crashworthy," although summary judgment for defendant was affirmed in that case because consumers had no right to expect crashworthiness to be enhanced by a technology, air bags, known to be non-existent in the vehicle.  *Cooper v. General Motors Corp.*, 702 So. 2d 428, 443 (Miss. 1997).  The court thus finds that a reasonable juror could conclude that the side window system of the 1988 GMC Sierra failed to function as expected under § 11-1-63.

GM also contends that plaintiffs have not sufficiently established the existence of an alternative design for the side window system that would have prevented Adam Betts' death.  Miss. Code Ann. § 11-1-63(f)(ii) requires plaintiffs to prove that, at the time the 1988 GMC Sierra left GM, a feasible design alternative existed that would have to a reasonable probability prevented the death of Adam Betts in this specific crash.  GM's support for this claim comes

from Dr. Batzer's statement in his deposition that if GM had only changed the tempered glass window pane to laminated glass, as he suggested in his design report, that would not have been enough to prevent Adam Betts' death.

GM argues that the comprehensive sixty-nine page report produced by Dr. Batzer on his proposed alternative designs, as well as the multitude of industry research and testing produced by Dr. Batzer which supports his proposed alternative designs for the entire side window system, are just conceptual suggestions. *See Watkins*, 121 F.3d at 992. GM argues that plaintiffs must present a specific alternative design for the side window system of a 1988 GMC Sierra, not just a compilation of design concepts and data. *Id.* The court thoroughly reviewed plaintiffs' alternative designs in GM's *Daubert* motion to limit the testimony of Dr. Batzer and determined that they are sufficient to create a question of material fact. For the reasons stated, GM's motion for partial summary judgment as to the plaintiffs' side window system design defect claim will be denied.

### 3.  Plaintiffs' Breach of Warranty Claims

GM argues that plaintiffs' claims for breach of warranty are time barred by Miss. Code Ann. § 75-2-75, which provides that "[a]n action for breach of any contract for sale must be commenced within six (6) years after the cause of action has accrued." Miss. Code Ann. § 75-2-75; *see Estate of Hunter v. General Motors Corp.*, 729 So. 2d 1264, ¶47 (Miss. 1999). The cause of action accrued when the tender of delivery of vehicle occurred. *Robinson v. General Motors Corp.*, 150 F.Supp. 2d 930, 933 (S.D. Miss. 2001). More than six years have elapsed between the time the subject 1988 GMC truck left GM and the date that plaintiffs filed this lawsuit; therefore, plaintiffs' breach of warranty claims are time barred.

Further, plaintiffs did not buy the truck from GM, so they have no breach of implied warranty of fitness for a particular purpose. Under Mississippi law, the warranty for fitness for a particular purpose is not applicable where plaintiffs did not purchase the product from the defendant. *Austin v. Will-Burt Co.*, 232 F.Supp. 2d 682, 688 (N.D. Miss. 2002), *aff'd*, 361 F.3d 862 (5th Cir. 2004); *Albritton v. Coleman Company*, 813 F.Supp. 450, 455 (S.D. Miss. 1992). It is undisputed that plaintiffs did not purchase the vehicle from GM; therefore, they never relied on the skill or knowledge of GM's representatives in purchasing the product. For the reasons stated above, plaintiffs' breach of warranty claims are dismissed.

**4. Plaintiffs' Negligence Claims**

GM next argues that plaintiffs' negligence claims simply reiterate their product liability claims, and therefore, should be dismissed. *Austin*, 232 F.Supp. 2d at 691; *see also Estate of Hunter*, 729 So. 2d at 1277-78. The Mississippi Supreme Court has observed that the risk-utility analysis test of *Prestage* is a detailed expression of the negligence formula. *Hunter*, 729 So. 2d at 1277. Plaintiffs argue, however, that "the MPLA was not 'intended to abrogate the long established common law theory of negligence.'" *Childs v. General Motors Corp.*, 73 F.Supp. 2d 669, 672 (N.D. Miss. 1999) (*quoting Taylor v. General Motors*, 1996 WL 671648 (N.D. Miss. 1996). The MPLA notwithstanding , the Supreme Court of Mississippi has held that it does not constitute reversible error for a court to refuse to instruct a jury as to both negligence and as to a defective design theory under the risk-utility standard. *Hunter*, 729 So. 2d at 1277. For these reasons, plaintiffs' negligence claims will be dismissed.

**E. CONCLUSION**

For the reasons previously stated, it is ordered that GM's motion to strike Dr. Batzer's proposed deposition changes [194] is granted, while plaintiffs' motion for leave to submit an amended errata sheet [204] is denied. Further, GM's *Daubert* motions to limit the testimonies of Herbert Yudenfriend [192] and Donald Phillips [196] are dismissed as moot, and its *Daubert* motions to limit the testimonies of Michael Reyes [206], Steve Batzer [208], and Allan Kam [190] are denied. Similarly, plaintiffs' *Daubert* motion to limit the testimony of Kon-Mei Ewing [215] and their motion for a consolidated *Daubert* hearing [217] are denied. Finally, GM's motion for partial summary judgment as to plaintiffs' seatbelt design defect claim [185] is granted, while its motion for partial summary judgment as to plaintiffs' glass defect claim [210] is denied.

So **ORDERED**, this the 16th day of July, 2008.

**/s/ MICHAEL P. MILLS                    **
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**